[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This decision dissolves the nineteen-year marriage of Sylvia and Brian Mierzejewski. The principal issues before the court are which parents two of the minor children should live with, disposition of the marital home, and orders for child support and alimony. The Judicial District of CT Page 5689 Waterbury referred the case to the regional family trial docket for trial of these issues, held on four days in March of this year. Each party testified and the court also heard testimony from the following witnesses:
 • Sharon A. Copes, a family relations counselor for the judicial branch who prepared the initial custody study completed September 15, 2000;
 • Sylvia Richard, M.S.W., a family relations counselor in the judicial branch, who prepared an updated custody study completed January 11, 2002;
 • Rick Spunzalas, an employee of the American Eagle Credit Union, where the defendant has deposited funds and which provided a first mortgage and home equity loan to the parties;
 • Katherine Demers, Elizabeth Ann Martin, and Susan Loin, sisters of the defendant;
 • Mark and Elizabeth Mierzejewski, a brother and sister-in-law of the defendant; and
 • Attorney Thomas P. Pettinicchi, the court-appointed guardian ad litem (GAL) for the minor children.
Each party and the GAL also introduced various exhibits into evidence, including the custody studies prepared by family relations counselors Copes and Richard and the written report dated October 2, 2001, of a psychiatric evaluation of the parties by Dr. Kenneth Robson, M.D.
 I — FINDINGS OF FACT
The court has observed the demeanor of the parties and evaluated their credibility. The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. The court has carefully considered the statutory criteria for dissolving a marriage and entering orders regarding custody, visitation, child support, alimony, orders of life and health insurance and payment of the child's health expenditures, and the award of counsel fees.
After making jurisdictional findings and a brief summary as to the background and situation of each party, the court will discuss the key CT Page 5690 issues here.
A. Jurisdictional Findings
The court finds that it has jurisdiction over the marriage. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married in Wallingford, Connecticut, on April 16, 1983. They have three minor children who are legal issue of the marriage: Meghan, born June 13, 1985; Adam, born August 11, 1988; and Faith, born March 31, 1994. The oldest of the parties' offspring, Erin is now 18 years of age and a senior in high school;. while no longer a minor subject to this court's orders regarding custody or visitation, she will be the beneficiary of this court's orders for child support until her graduation from secondary school. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
B. The parties
The court finds no fault in the breakdown of this marriage. Irreconcilable differences in their religious beliefs and practices, and in the relationships of the parties to the husband's extended family, arose immediately after they were married, festered throughout the marriage, and culminated in disagreement over how to respond to psychiatric problems of the plaintiff's oldest child, James Ledford, a son from a previous marriage. The defendant is a devout Roman Catholic who attends daily mass. He comes from a very close-knit family for which their religious faith was a very important part of their daily lives and values. He has six siblings, four of whom live in Connecticut. Both his parents are still alive and live here as well. He spends most of his spare time with his family of origin, and has no other close friends at work or in the community. The plaintiff is a Christian but has not affiliated herself with a specific denomination. Her first marriage, in 1978, lasted less than a year, after which she left Tennessee with her first son, and moved to Connecticut, where she met and then married the plaintiff.
From the earliest days of the marriage, the plaintiff perceived her husband's family as not accepting her, judging her harshly because she had refused to have her first marriage annulled before marrying the defendant, and treating her first son less well than their biological grandchildren. She felt unwelcome and uncomfortable in the defendant's church that played such an important part of his life. Although aware of his wife's distress over these matters, the defendant nonetheless felt they had a good and happy marriage. Counseling over the years did not CT Page 5691 bridge a growing gulf between the parties, which the defendant did not recognize. When served with the divorce papers, he was completely surprised.
A high school graduate, the defendant has few marketable job skills. She worked at Antonelli's meat market in Wolcott while in school and afterward until she left Connecticut to get married; after returning from Tennessee, she again worked there until obtaining better employment. She met the defendant several years later, in 1982, when both were working at Airpax in Cheshire, she doing soldering in the factory and he as an electrical engineer. After their first child was born, she was, by agreement of the parties, a stay-at-home mom. After this proceeding began, at the direction of the court, she re-entered the job force and resumed working in March 1990 as a meat cutter at Antonelli's, until tendinitis in her elbow prevented her from doing so and she lost that job after seventeen months there. Since then she has made little effort to search for new employment and has relied on the defendant to continue supporting her. Almost 44 years old, her education completed upon high school graduation, unable to work in jobs that require repetitive arm motion, and without any specific work skills, she will have a difficult time supporting herself, or children in her care, in the immediate future. A job at minimum wage is the most likely starting point for her.
The defendant is 45 years old, in good health, and a college graduate with an engineering degree from Northeastern University. For the last ten years he has been employed as an engineer for Otis Elevator, which recently supported his obtaining a masters degree in business from Rensselaer Polytechnical Institute. His continued employment prospects are good, as is further advancement and success in his current employment. He has always been, both before and after the return day here, the principal source of support for the plaintiff and their four children. The defendant also supported the plaintiff's first child, James, who lived with the parties after they were married until he turned age 18, when he left their home to go live with his father in Tennessee.
C. The children
The parties have four children. Erin is 18 years old and a high school senior. Meghan is 17 and a high school junior. Adam is 13 and in the 8th grade. Faith just turned 8 years old and is in second grade. All attend public schools in Wolcott, where they have lived all their lives. Meghan plans to attend Central Connecticut State University next year; Erin plans to attend college the year after. The two oldest offspring are mad at their mother for filing the divorce, having their father served with the divorce papers when the family was having dinner together, and breaking up the family unit. Both want to live with their father after CT Page 5692 the dissolution. Almost 17 years old, Meghan is of sufficient age and maturity that her opinion as to which parent she lives with should count heavily. Both parties recommend, and the court agrees, that she should live with the defendant. Since Erin has reached the age of majority, the court has no authority to order a custodial parent, but recognizes that she will live with her father, a fact the court must consider in terms of the child support orders until she graduates from high school.
To assess the best interest of the younger children for the custody decision requires the court to evaluate the parties' conflicting claims about the other's parenting skills. Until she filed the divorce, the plaintiff was the primary caretaker for all four children — making medical appointments, buying clothing, taking them to extracurricular activities, waking and preparing them for school, etc. She was also primarily responsible for cleaning and upkeep of the house. The defendant left for work early in the morning, would cook dinner at night, shared transportation of the children to sports activities, and did outside chores on the weekends. The plaintiff contends that the two youngest children would feel more stable and secure living with her since she has always been the one primarily responsible for them. The defendant, on the other hand, asserts, in effect, that the plaintiff is erratic, psychologically unbalanced, and cannot presently meet the younger children's needs. He claims that she is depressed, spends much of the day sleeping or watching television and has, since she filed the divorce, abdicated to him the role of primary household manager. He asserts that her refusal to maintain outside employment not only reflects an unrealistic assessment of her life after the divorce but also shows that she will not be able to function adequately after the divorce.
Yet all the outside evaluators who have looked at this family since the divorce was filed have concluded that both parents are good parents capable of meeting the needs of any of these children:
 • "This matter involves two very good parents [whose] parenting styles differ slightly." Custody Evaluation Report prepared by Sharon Copes, September 15, 2000.
 • "[Plaintiff's] love and devotion to the four children is unquestionable and her ability to care for them is evidence as she has . . . provided excellent care for four well adjusted children. . . . [B]oth parents have shared in raising the children and should continue assuming primary roles in the children's lives. . . . It is . . . recommended that the parents share joint custody and shared residency CT Page 5693 of the two younger children." Custody Evaluation Report prepared by Sylvia Richard, January 11, 2002.
 • "[W]e have two loving and caring parents here. It is my opinion that there is no great disparity between the abilities of these two parents. The disparity is slight at best, but it does exist." GAL Exhibit 2, Guardian Ad Litem's Basis for Recommendation.
In response to the defendant's report that the plaintiff was depressed and sleeping excessively, the court ordered a psychiatric evaluation of both parties, which was performed by Dr. Kenneth Robson, M.D. Although Dr. Robson did not testify, the defendant introduced the report of that evaluation and Dr. Robson's professional vita into evidence. Dr. Robson concluded that "neither [party] suffers from a disturbance that should significantly impair parenting capacities." He diagnosed both parties as showing organized and goal-directed thinking and exhibiting "adjustment disorder with depressed mood," which he described as "expected and mild, occurring in the context of the stress of divorce." He also diagnosed the plaintiff as having dysthymic disorder, a "chronic, low-level mood disorder that generally responds well to anti-depressant medication." Dr. Robson believed that any excessive sleeping by the plaintiff indicated that she "is inadequately medicated." The plaintiff is currently in weekly therapy with a clinical psychologist, who reported to the family relations counselor that he believed the plaintiff was only suffering from "situational depression."
The reports that the plaintiff sleeps emanate from the defendant and the two older daughters, all of whom have an interest in this proceeding — the defendant wants custody of the two minor children, and the older daughters are furious with their mother for disrupting the family and their own lives. From the evidence offered, it is hard to evaluate whether the defendant and his daughters are describing the plaintiff's behavior accurately. The plaintiff adamantly denied that she spends too much time sleeping. There is no evidence of any failure on her part to care for the children adequately during times they are in her care. For example, the parties have both remained in the marital home with all four children while this case has been pending. The defendant leaves the house every morning at 6:30 a.m. so that he can attend daily mass before arriving at work. The plaintiff has continued her traditional role of waking the children in the morning, ensuring that the younger ones are ready for school, and preparing school lunches. There is no credible evidence that she has failed in or neglected her parental responsibilities before or after school. She continues to make afternoon CT Page 5694 snacks or meals for the children and monitor their homework. The court thus concludes that any problem the plaintiff may have been having in this area is situational and related to the divorce.
When the plaintiff brought this action, she did not foresee all of its consequences. She knew that she wanted to end the marriage but did not realize that economic and legal realities would also require her to relinquish the role she so cherished as a stay-at-home mom and rejoin the work force. She has had difficulty accepting this change in role. Although she testified that she has been seeking employment since leaving Antonelli's, her efforts have been half-hearted. The court concurs with the family relations counselors and GAL that the plaintiff still harbors an unrealistic hope of staying home days after the divorce.
In the weeks and months after she filed this action, the defendant began assuming a. much larger share of family responsibilities. Although he had always cooked most family dinners, he assumed an ever greater role in shopping, housework, and transporting the children. The plaintiff perceived his doing so as usurping her role, but that perception again mirrors her aspiration to continue in the role of stay-at-home mom. The defendant, to his great credit, although distressed at the divorce, recognized that a dissolution meant the parties' roles would have to change. He has managed to accommodate his conduct to the new realities more quickly and with greater success than the plaintiff. Yet with many of her former household responsibilities now assumed by the defendant, the plaintiff has had less to do at home — so, she sits around sometimes, watches television more than she once might have, and perhaps even sleeps more. At trial, the plaintiff said that she knew she needs to work, and the court concludes she was being sincere when she so testified; but she has not yet acted decisively enough in seeking employment. She will now have to do so. From all the evidence before the court, the court concludes any depression or sleeping on the plaintiff's part do not impede her from meeting her children's needs.
The court had the opportunity to see, hear, and observe both parties during their testimony and the trial as a whole. The plaintiff showed good insights into the needs of her children. At times during her testimony, or that of other witnesses, she acted somewhat agitatedly, by speaking in a loud voice or gesturing, but nothing she did was excessive or inappropriate, and appeared consistent with being upset. Yet the court finds her descriptions of each of her children — their individual situations, wants, and needs — to be astute and consistent with the reports of the GAL and family relations counselors. The defendant also appeared appropriate and sensitive to the needs of his children, but the court concludes that during the pendency of this divorce he used his control of the family finances to court the affection and loyalty of his CT Page 5695 children during the divorce. In the family dynamics the plaintiff has always been the stricter parent and the defendant more permissive. The two older daughters have particularly appreciated the greater laxity and latitude their father has afforded them while resenting and disagreeing with their mother's lesser indulgence of them.
Both family relations counselors recommended shared parenting time of Adam and Faith by their parents. Copes recommended equal times with each parent, Saturday evening to Wednesday morning with the defendant, Wednesday morning until Saturday evening with the plaintiff. She also recommended that all four children remain in the marital home, and that the parents alternate living in the house during their parenting times. Richard concluded a year later that it was not financially realistic for the parties to maintain three households — the marital home for the children and the custodial parent of the moment, a second home for plaintiff when defendant had parenting time, and a third for defendant during plaintiff's parenting time. Richard also recommended shared parenting, but proposed that parents and counsel work out the actual schedule. The GAL has also recommended shared parenting, but he proposed a specific schedule that would have Adam and Faith live with their father all weekday evenings, spend time with their mother Wednesday afternoons, and split weekends 5 days a month with plaintiff and 3 days with the defendant.
The court also concurs with the idea of shared parenting of Adam and Faith. Although they are six years apart in age, and sometimes bicker, each still has a significant number of years left living at home with their parents (unlike the older daughters, who are both close to leaving home). The court concludes that, at least for now, Adam and Faith should live together, and have their court-scheduled parenting time with each party together. Faith has consistently stated she wants to live with her mother. Although Adam has vacillated, and does not want to hurt either parent's feelings, he too wants to live with his mother. He says that she is more comforting to him than the plaintiff and listens to him better. These wishes are not binding on the court, but the court does consider them as indicating the children's own belief in who would care for them better. The court also concludes that Adam, at age 14, is mature enough that his view is entitled to significant weight. Faith is only 8, and hence less mature, and the court gives her preference accordingly less weight. The court's own findings, however, are that the plaintiff mother is more sensitive and attuned to these two children's overall needs. The court makes this finding in no way critical or disparaging of the defendant's parenting capabilities, or implying that he is not sensitive to the needs of Adam or Faith. These children are fortunate to have two loving, caring, and capable parents. The defendant's work schedule, moreover, even if more flexible now than in the past, will require him to CT Page 5696 rely on family members for day care help, whereas the plaintiff has flexibility to find employment with hours that will make her available to the children in the late afternoons after school. On balance, after considering all the evidence and weighing the many factors relevant to the children's best interest, the court concludes that Adam and Faith should spend more time with their mother than father, but under an order of joint and shared custody.
D. Financial Issues
 1. Marital Property
"There are three stages of analysis regarding the equitable distribution of each resource; first, whether the resource is property within Section 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties." Krafick v. Krafick, 234 Conn. 783,792-93 (1995). The court finds that all property listed on each party's financial affidavit is marital property subject to equitable distribution. The parties have disputed the value of their most significant asset, the marital home at 43 Cancellaro Drive in Wolcott. The plaintiff maintains that it has a current fair market value of $182,500; the defendant places its value at $150,000. Though neither party offered independent evidence of value, or an appraisal, our law has long allowed a parry to offer competent evidence as to the value of real estate it owns. Bank of Southeastern Conn. v. Nazarko Realty G.,49 Conn. App. 452, 458, 714 A.2d 722. The court finds the plaintiff's testimony on the value of the house credible and finds it to be worth $182,500. There is a first mortgage and home equity loan/second mortgage that encumber the house in the approximate amount of $59,000.
During the dissolution proceeding, the amount owed on the home equity loan has increased from approximately $6,500 to almost $17,000. The defendant had exclusive control over the home equity account and withdrew approximately $10,000 during this time. of that amount, he used $5,700 to purchase and repair a used Chevy Blazer. The court concludes that a similar amount should be deducted from the equity in the home, and assigned to the plaintiff, and then the balance of equity in the home divided equally between the parties. The parties have agreed to split the defendant's deferred compensation totaling approximately $43,000.
The remaining question in dispute as to marital property is disposition of the marital home. The defendant wants to buy out the plaintiff's interest so that he can offer the children continued residency in the house in which they grew up. The plaintiff, recognizing she lacks the CT Page 5697 income or resources to do the same, believes it unfair that the defendant has such an opportunity. The court heard copious testimony from the defendant and GAL and received exhibits from the family relations counselors and GAL that make it clear the two older daughters very much want to continue living in the marital home. The two younger children are less focused on the house where they live, and more on with which parent. Continued occupancy or ownership of the house by either party does not appear to benefit or disadvantage either in future questions regarding parenting time. The court thus concludes that it is appropriate to grant ownership interest in the marital home to the defendant after he has paid the plaintiff her equitable share, as set forth in the orders below.
2. Alimony
After considering all the statutory factors, the court concludes that an award of alimony to the plaintiff is necessary for a period of years. She will need time to gain sufficient vocational skills and employment history to support herself and children in her care. The parties agreed during the marriage that the plaintiff would stay at home to care for their children. The disparity in the parties' employability and occupational skills and the plaintiff's current vocational deficit result in large part from that marital agreement. The plaintiff's failure to better her job skills since filing the dissolution complaint or to make good faith efforts since losing the job at Antonelli's to seek other employment have contributed to her vocational situation as well, but to a far lesser degree than the parties' agreement and actions during the years before this action. Accordingly the term and amount of alimony must recognize the effect of the marital roles on her current employability and provide time for the plaintiff to improve her vocational status and acquire adequate income. Considering those factors, as well as all the statutory factors, the court concludes that the term of alimony requested by the plaintiff, nine years, in the amount of $200 per week, is appropriate.
3. Child support
The plaintiffs only source of income currently is the pendente lite order of alimony. Tendinitis in her elbow limits her use of one arm, but she has introduced no evidence of other functional limitations affecting her ability to work. She did not make good faith efforts to obtain employment after she lost the job at Antonelli's. Nothing other than her own desire to maintain her role as a stay-at-home mom prevented her from acquiring other employment. The court finds that she has the capacity to earn income at least at minimum wage rate for at least thirty hours per week. CT Page 5698
The child support guidelines require the court to determine each party's actual current gross and net income and, using those figures, determine the presumptive current support amount. See Regs. Conn. State Agencies, §§ 46b-215a-2a (c) and (d). A party's earning capacity may be considered, however, as a criterion for deviating from the presumptive support amount. Regs. Con. State. Agencies, § 46b-215a-3 (b). Because this is a split custody situation, with two of the children subject to the child support order (Erin until she graduates from high school or turns age 19 and Meghan) living with father and two living more often with mother (Adam and Faith), the guidelines also require the court to determine the presumptive support amounts due to each parent for the children in their custody. See Regs. Conn. State Agencies, §46b-215a-2a (d). The court finds here that the presumptive current support amount, based on each party's actual incomes at the time of trial, would require the defendant to pay the plaintiff the sum of $308 per week in child support for Adam and Faith, and the plaintiff to pay nothing, as she has no actual income other than alimony (which the guidelines do not include in determining income; § 46b-215a-1 (11) (A)). The recommended support order would thus be, if the court applied the presumptive amounts, $308 per week from defendant to plaintiff.
The court finds here, however, that it is appropriate to apply the deviation criterion of the plaintiff's earning capacity in determining child support. Based on the court's finding that she has earning capacity at minimum wage of $6.70 per hour for at least 30 hours per week, the court finds her earning capacity to be $201 per week gross income. Applying the calculations and methodology of the child support guidelines, the court orders defendant to pay plaintiff child support of $246 per week until Erin graduates from high school, and $263 per week thereafter. The court's allocation of responsibility for unreimbursed health-related expenses and work-related daycare also tracks guideline calculations based on the plaintiff's earning capacity.
 II — ORDERS
After considering all the statutory factors set forth in General Statutes § 46b-81 (c) as to equitable distribution of property, § 46b-82 as to alimony, § 46b-84 as to support of a minor child, § 46b-215a-1 et seq., Regs. Conn. State Agencies, as to child support, and § 46b-62 as to counsel fees, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
1. Dissolution of Marriage: The marriage of the parties, having broken down irretrievably, is hereby dissolved. CT Page 5699
2. Parenting Orders[1]
a. The parties shall share joint legal custody of the three minor children, who shall remain in the Wolcott schools throughout high school unless the parties otherwise agree or a court amends this order. Each parent shall be responsible for transporting the children to activities and appointments when the children are with them, and for transporting the child to the other parent. The parents should strive to schedule parenting time so that all four siblings may spend as much time together as possible.
b. Meghan shall live with the father. The mother may have such parenting time with her as Meghan desires.
c. The parties shall share parenting responsibilities for the two younger children, Adam and Faith, on a four-week schedule as set forth below:
(1) During the first and third weeks, the mother will have parenting responsibilities from Monday after school through Friday morning, and the father from after school in Friday until Monday morning. In the third week, the father shall also have parenting responsibilities on Wednesday after school until 8:00 p.m.
(2) During the second week, the mother will have parenting responsibilities from Monday after school through Wednesday morning, the father from after school on Wednesday until school on Friday, and then mother from after school on Friday through the end of the weekend and until the father's next parenting time on the following Wednesday.
(3) During the fourth week, the mother will have parenting responsibilities from Monday after school through Saturday at 5:00 p.m., except that the father will have the parenting responsibilities on Wednesday after school until the beginning of school on Thursday. From Saturday at 5:00 p.m. until the beginning of school on Monday, the father will also have parenting responsibilities.
(4) Vacation and Holiday modifications:
(a) Vacation and holiday periods shall modify the above schedule and not be included in the four-week rotation.
(b) During academic year school vacations, Adam and Faith shall split their weekday and weekend time equally between the two parties. If the parties cannot agree on a parenting schedule, then the parties will CT Page 5700 alternate such that the children are with one parent from Monday morning through Thursday at 8:00 p.m. and the other parent from Thursday at 8:00 p.m. until after school on the following Monday. For the next and all such vacations thereafter, the parents will switch which has the Monday through Thursday period and which has the Thursday through Monday period.
(c) Each parent may spend two separate uninterrupted weeks during the summer with Adam and Faith. Adam and Faith shall be together for those weeks unless the parties agree otherwise. These weeks will not be included in the four-week rotation. The parties shall notify each other by April first of each year of the two week-long periods they seek with the children. If both parties seek the same weeks for their exclusive summer parenting time, then in odd-numbered years the mother shall make final decision and in even-numbered years the father may do so with regard to which parent spends which summer weeks with the children.
(d) Adam and Faith will divide the Christmas holiday vacation so that one party has parenting responsibility from after school on the day the vacation begins until 11:00 a.m. on Christmas day and from 11:00 a.m. on New Year's Day until the children return to school; the other party will have parenting responsibility from 11:00 a.m. on Christmas morning until 11:00 a.m. on New Year's Day. In 2002 the father will have parenting responsibility for the portion of this cycle that includes Christmas eve.
(e) Adam and Faith will alternate all legal and school holidays between their parents, spending the night with the parent with whom they spend that day. They shall spend mother's day and night with plaintiff and father's day and night with defendant.
(f) Birthdays of either child shall not interrupt the four-week rotation, but the children may spend two hours on such days with whichever parent with whom they will not spend the night.
d. Both parents shall have reasonable telephone contact with the minor children when the children are with the other parent. Reasonable shall mean at least one telephone call a day.
e. Both parents shall treat each other with respect and courtesy. Neither parent shall make any derogatory remarks about the other parent in front of the children or within their hearing. Each parent shall seek to foster a close, loving, respectful, and positive relationship of their children with the other parent and with the other parent's extended family. CT Page 5701
f. Both parties shall immediately notify the other of any serious or emergency health issues involving a child when any of them are with that parent, and shall keep the other party informed of routine health matters involving all the children.
3. Equitable distribution of property: Each party may retain, free and clear of the other, all assets listed on their respective affidavits, except as set forth below.
a. The court awards title and interest to the marital home to the defendant husband, free of any claim of the plaintiff, upon payment by defendant to the plaintiff of the sum of $70,000. The defendant shall convey such sum to her within ninety days of the date of this decision. No later than her receipt of such sum, the plaintiff shall by quitclaim deed convey to the defendant all of her right, title and interest in such property. The plaintiff may continue to live in the house for thirty days after receiving this sum from the defendant. Until transfer of the title, defendant shall be responsible for paying the house mortgage, the home equity loan, real estate taxes, property insurance, house utilities, maintenance of the house, and any such expenses accrued and unpaid as of the date of this decision, and shall indemnify and shall hold the wife harmless on any such costs or expenses. After the plaintiff has conveyed her interest in the house to the defendant, the defendant shall indemnify the plaintiff and hold her harmless for any liability she may incur for the first mortgage, home equity loan, or real estate taxes accruing or payable after the date of her quitclaim deed to him.
b. The parties shall divide equally the defendant's UTC Savings Plan and IRA, based on their value as of the date of this judgment. Defendant's counsel shall prepare the appropriate qualified domestic relations orders, and the parties shall share equally the cost of preparing the QDROs. The court will retain jurisdiction for purposes of approving the QDROs.
c. The court awards title and ownership interest in the Chevy Blazer to the defendant and the Plymouth Voyager to the plaintiff. The parties shall execute any legal documents necessary to effectuate any titles or ownership interest thereon.
4. Financial responsibility for indebtedness: Each party shall be responsible for paying all debts and liabilities listed on their respective financial affidavits, and shall indemnify and hold the other harmless thereon. The defendant shall be responsible for paying any past due real estate taxes or mortgage payments, and interest thereon, and shall indemnify and hold the plaintiff harmless thereon. CT Page 5702
5. Child Support:
a. The defendant shall pay the plaintiff child support in the amount of $246 dollars per week until Erin graduates from high school or reaches age nineteen, whichever comes later. After that, defendant shall pay plaintiff child support in the amount of $263 per week until Meghan graduates from high school or reaches age nineteen, whichever comes later. After that, the non-custodial parent shall pay child support in an amount to be determined by a court of competent jurisdiction based on then-applicable child support guidelines.
b. Health insurance for the minor children
Under General Statutes § 46b-84 (f), the court dissolving a marriage must include provisions in the support order for health insurance coverage for any minor children. The court orders the defendant to maintain health insurance coverage for the three minor children.
c. Unreimbursed child care and health expenses.
In addition, the parties shall pay the following percentages of unreimbursed medical and health-related[2] expenses for the minor children (after the first one hundred dollars a year, which is the responsibility of the custodial parent), and of reasonable child care expenses necessary to allow either parent to maintain employment. These percentages are computed in accordance with the child support guidelines.
(1) Until Erin graduates from high school or reaches age 19 (whichever occurs earlier), the plaintiff shall pay 39% and the defendant 61% of Erin's and Meghan's unreimbursed medical and health-related expenses and of defendant's reasonable child care expenses; and plaintiff shall pay 11% and the defendant 89% of Adam's and Faith's unreimbursed medical and health-related expenses and of plaintiff's reasonable child care expenses.
(2) After Erin reaches age 19 or graduates from high school and until Meghan has also graduated from high school or reached age 19, the plaintiff shall pay 38% and the defendant 62% of Meghan's unreimbursed medical and health-related expenses and of defendant's reasonable child care expenses; plaintiff shall pay 12% and the defendant 88% of Adam's and Faith's unreimbursed medical and health-related expenses and of plaintiff's reasonable child care expenses.
(3) Thereafter, payments for child support, unreimbursed medical and health-related expenses, and reasonable child care expenses shall be determined by a court of competent jurisdiction applying then-applicable child support guidelines. CT Page 5703
d. Pursuant to General Statutes § 52-362 (b), the court enters an order for immediate wage withholding for payment of child support, subject to the rights of the parties after issuance of this decision to agree to an order of contingent withholding. The court has no evidence as to whether the defendant has previously been advised of the minimum amount of income which is exempt from withholding under state and federal law, his right to claim any applicable state or federal exemptions with respect thereto, and his right to offer any evidence as to why a withholding order effective immediately should not issue. The defendant may, upon motion to the court, offer any evidence as to why a withholding order should not issue.
6. Life Insurance: The defendant shall maintain such life insurance as is available from his employer, naming the plaintiff as primary beneficiary and any minor children any minor children as secondary beneficiaries, for as long as he remains legally obligated to pay alimony or child support.
7. Tax exemptions: The parties shall equally divide the child tax exemptions and child tax credits except in years when they are not able to claim such for an even number of children. When the parties are only able to claim tax exemptions for an odd number of children, they shall divide them unequally and alternate years in which one may claim more than the other; in the first such year, defendant may claim the greater number of exemptions and credits.
8. Alimony: The court orders the defendant to pay the plaintiff alimony in the amount of $200 per week for nine years from the date of this decision. Such amount shall terminate upon death of either party, remarriage of the plaintiff, or her cohabitation with a male pursuant to General Statutes § 46b-86 (b).
9. Counsel fees: Each party shall be responsible for paying its own attorney's fees. They shall split equally any remaining fees for the guardian ad litem.
Judgment will enter accordingly.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT